UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
UNITES STATES OF AMERICA,         )
                                  )
          v.                      )   CRIMINAL ACTION
                                  )   NO. 05-10335-WGY
ROBERT MITTEL-CAREY,              )
          Defendant.              )
                                  )
```

MEMORANDUM

YOUNG, D.J.                                    October 20, 2006


**I.    INTRODUCTION**

In <u>Michigan</u> v. <u>Summers</u>, 452 U.S. 692, 704-05 (1981), the
Supreme Court held that pursuant to a lawfully executed warrant,
the officers involved in searching a home have limited authority
to detain the occupants during the search.  The Supreme Court
explained that such detention "is not likely to be exploited by
the officer or unduly prolonged in order to gain more
information, because the information the officers seek normally
will be obtained through the search and not through the
detention."  <u>Id.</u> at 701 (footnote omitted).  This case tests
whether federal agents exceeded their limited authority when they
interrogated a detained suspect without reading him his rights
pursuant to <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966).

On May 12, 2006, the Court heard testimony and oral argument pursuant to the motion of the defendant Robert Mittel-Carey ("Mittel-Carey") to suppress statements he made during a lawful search of his home on January 20, 2005.  Mittel-Carey argued that during the search he was subjected to custodial interrogation without first having been administered his <u>Miranda</u> warnings and that consequently his statements ought be suppressed.  The Court held that the interrogation exceeded the justification for the detention authorized in <u>Michigan</u> v. <u>Summers</u>, 452 U.S. 692 (1981). The Court further ruled that Mittel-Carey was in custody when interrogated and should have been adequately and effectively appraised of his <u>Miranda</u> rights.  The following analysis provides the reasoning for the Court's rulings.

**II.  FINDINGS OF FACT**

At approximately 6:25 a.m. on January 20, 2005, eight FBI agents surrounded the home of Robert Mittel-Carey located in Lowell, Massachusetts.  Hearing Transcript ("Tr.") [Doc. No. 27] at 8, 9, 53.  Mittel-Carey and his girlfriend, Colleen Nystrom ("Nystrom"), awakened to a loud "banging all around [their] house."  Tr. at 65.  Nystrom answered the door while Mittel-Carey remained upstairs in the bedroom.  <u>Id.</u>  Upon opening the front door, she was confronted by Agent Melissa Lawson ("Lawson") and three other agents who showed her a search warrant for the premises.  Tr. at 11-12.  Nystrom was told to step aside while

2

Lawson and two other agents went upstairs to get Mittel-Carey. Tr. at 13, 65.

The first agent to enter the bedroom was Agent Laurence A. Travaglia ("Travaglia"), who testified that the house was dark and that when he entered the room he held his flashlight in his left hand and used his right hand to hold his weapon behind his leg. Tr. at 13-14. Mittel-Carey was lying in his bed when Travaglia and another agent entered. Tr. at 15. Mittel-Carey was told to place his hands up where the agents could them see them and was directed to get out of bed. Id. Travaglia had a brief conversation with Mittel-Carey about the search warrant before he escorted him downstairs and seated him in the dining room. Tr. at 15-16. While Mittel-Carey was being brought downstairs, other agents escorted Nystrom upstairs to separate them. Tr. at 67. Lawson then asked Mittel-Carey a few questions about whether there were any additional items of child pornography other than those found on his computer. Tr. at 18-19.

Mittel-Carey answered, "No, everything is on the computer." Id. at 19. Afterward, Lawson asked Travaglia and Detective Tony Turco ("Turco") to interview Mattel-Carey concerning the alleged transmission and possession of child pornography. Tr. at 19-20. Lawson then went upstairs to speak with Nystrom. Mittel-Carey

was relocated to the living room where Turco and Travaglia began their questioning.  Tr. at 20.

Travaglia testified that he explained to Mittel-Carey that the agents were searching his house based on the investigation of an undercover operation in Florida that had uncovered Mittel-Carey's attempt to transmit at least three images of child pornography to a person whom Mittel-Carey thought was a 14-year-old girl but who was in reality an undercover agent.  Tr. at 22. Travaglia also stated that he then told Mittel-Carey that he did not have to respond, but that in his experience, "those individuals that cooperated with investigations at the onset . . . tended to fare better if a deal was to be had later on down the road."  Tr. at 22-23.  Travaglia further purported to describe the workings of the federal Sentencing Guidelines and claimed "that there was a provision for acceptance of responsibility which may qualify him for a reduction in sentence."  Tr. at 23.[1]

In response, Mittel-Carey asked the question "Should I have an attorney for this?"  Tr. at 23.  Travaglia responded by saying he "could not advise him one way or the other," but that it "was his right" and that the FBI would not interview him if he wanted an attorney first.  Tr. at 23-24.  Travaglia also told Mittel-

---

[1] Travaglia admitted in his testimony that it is his practice to tell suspects about the Sentencing Guidelines' "reduction for acceptance of responsibility" before an interview and that he has done so about a hundred times.  Tr. at 24.

Carey that "if he got an attorney, the attorney was going to tell him not to speak to the FBI." Tr. at 24. Additionally, Travaglia told Mittel-Carey that "based on what [they] anticipated [finding] on his computer and what he had already done he was looking at a lot of jail time." Tr. at 46. Travaglia testified that it was because of this initial conversation that Mittel-Carey decided to participate in the interview. Tr. at 46.

Mittel-Carey's interrogation lasted between an hour and a half to two hours. Tr. at 21. He was secluded in his living room with Travaglia and Turco. Tr. at 21. Meanwhile, the remaining six agents were in his home either participating in the search or monitoring Nystrom. It is uncontested that at no time during the interview or the search did any of the agents inform Mittel-Carey that he could leave the house. Tr. at 85-86.

On three occasions, Mittel-Carey asked permission to move around within the house. Mittel-Carey asked to use the bathroom during questioning and was granted permission, but an agent stood outside the bathroom with the door only partially closed so he could monitor the suspect. Tr. at 29. Mittel-Carey was also allowed to have a short conversation with his girlfriend when she was about to leave for work. There was an agent standing over them, however, as they briefly spoke and said good-bye to each other. Tr. at 69. At the conclusion of the questioning, Mittel-

5

Carey was allowed to go out on the back porch to feed his rabbits.  Again, he was accompanied by agents.  Tr. at 32-33.

While Mittel-Carey was being interrogated, Lawson was upstairs asking Nystrom several questions.  Tr. at 68.  She testified that she too asked permission to move about her own home and said that she "felt that they were escorting [her] and that they were in charge of the situation."  Tr. at 69.  Unlike Mittel-Carey, Nystrom did ask if she could shower and leave the home for work.  Id.  She was allowed to do so, but the officers monitored her the entire time, except when she was in the bathroom.  Even then, they inspected the bathroom before she was granted permission to shower.  Id.

After approximately two hours of eliciting self-incriminating information from Mittel-Carey, Travaglia shook Mittel-Carey's hand and left his home without ever placing him under formal arrest.  Tr. at 54.

## III. DISCUSSION

It is undisputed that the federal agents did not read the Miranda warnings to Mittel-Carey.  The question presented is whether the agents were required to do so during the course of a Summers detention.

### A.   The Scope of a Summers-Type Detention

In Miranda, 384 U.S. at 467, the Supreme Court explained that "without proper safeguards the process of in-custody

6

interrogation of persons suspected or accused of crime contains
inherently compelling pressures which work to undermine the
individual's will to resist and to compel him to speak where he
would not otherwise do so freely."  In light of these concerns,
"the prosecution may not use statements, whether exculpatory or
inculpatory, stemming from custodial interrogation of the
defendant unless it demonstrates the use of procedural safeguards
effective to secure the privilege against self-incrimination."
Id. at 444.

      In Summers, decided 15 years after Miranda, the Supreme
Court held that law enforcement officers are granted limited
authority to detain occupants of a home during a lawfully
executed search warrant for the amount of time necessary to
complete the search.  452 U.S. at 705.  The Court gave three
reasons justifying its holding.  First, detention may help
prevent a suspect from fleeing the scene in the event
incriminating evidence is found.  Second, detention may help
ensure the safety of the officers and protect the evidence.
Third, detention may facilitate an efficient and orderly search
by enlisting the help of the individuals detained.  Id. at 702-
03.  The Supreme Court explained that this type of detention is
less intrusive than formal arrest.  It further reasoned that a
person under normal circumstances would want to be present during
the execution of a search warrant, not only to prevent the

7

unnecessary damage and delays that might occur from the police's efforts to open locked doors and containers, but also to preserve the sanctity of their own privacy by being able to monitor the search and witness the result.  Id. at 701, 703.

The Summers Court stated that the sort of detention authorized "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention."  Id. at 701 (footnote omitted).  In other words, officers conducting a lawful search on a person's home are not permitted to use the suspect's detention to their official advantage by attempting to extract self-incriminating statements from the suspect.  See United States v. Freeman, 325 F. Supp. 2d 463, 469 (D. Del. 2004).

Since "custody" is but a subset of the myriad situations constituting the "detention" referred to in Summers, courts faced with the question whether the scope of a Summers search can be extended to allow formal questioning of suspects subject only to temporary seizure find this inquiry somewhat enigmatic.[2]

---

[2] A person can be questioned at any time by the police and those statements, if voluntary, can be admissible as evidence. The distinction, and crux of the problem here, is that when an individual's freedom of movement is constrained -- i.e., when a person is seized" for Fourth Amendment purposes, regardless whether that person is "in custody" or temporarily detained -- there must be lawful justification for the restraint such that person's freedom and the scope of the detention and what occurs during the seizure must be closely related to that justification.

Although the best practice is to administer Miranda warnings at the outset of an investigation incident to a search, the Supreme Court in Miranda expressly stated that the administration of procedural safeguards set therein is required only when there is a custodial interrogation of the suspect.  Miranda, 384 U.S. at 444.

Addressing this issue, federal courts have faulted law enforcement officers for exceeding the limited authority granted in Summers when interrogating suspects.  For instance, the Ninth Circuit in United States v. Kim, 292 F.3d 969, 976 (9th Cir. 2002), went so far as to infer that had the suspect in Summers been interrogated, he would have been entitled to Miranda warnings.  The Ninth Circuit cited Berkemer v. McCarty, 486 U.S. 420, 439-40 (1984), for the proposition that questioning beyond a Terry-type inquiry -- that is, anything more than asking a few questions to determine a person's identity and to obtain information confirming or dispelling one's suspicions -- is beyond the scope of the lawful detention prescribed by Summers. Kim, 292 F.3d at 976.

The Ninth Circuit has also declared unlawful an interrogation pursuant to a Summers-type detention.  See Ganwich v. Knapp, 319 F.3d 1115, 1122 (9th Cir. 2003).  In that case, the

_____

See Florida v. Royer, 460 U.S. 491, 500 (1983); Summers, 452 U.S. at 696-701; Terry v. Ohio, 392 U.S. 1, 19 (1968).

court grounded its reasoning in a principle of Fourth Amendment law to supplement the plain language inscribed in the Summers opinion.   Observing the holding of Florida v. Royer, 460 U.S. 491, 504 (1983), that a "seizure becomes unlawful when it is more intrusive then necessary," the Ninth Circuit harmonized the language of Summers with this principle by discouraging officers from exploiting the situation to obtain more information than normally would be found in the search.   Ganwich, 319 F.3d at 1122 (quoting Royer, 460 U.S. at 504).   The Ganwich court explained that "[t]he scope of a detention 'must be carefully tailored to its underlying justification.'"   Id. (quoting Royer, 460 U.S. at 500).

Since the justification for the detention in Summers is to (1) prevent the suspect from fleeing the scene; (2) ensure the safety of the officers and the integrity of potential evidence; and (3) help facilitate an efficient and orderly search, the detention of occupants of a search ought be limited to effectuating these objectives.   As the Ganwich court so pellucidly explained, the interrogation in issue "did not deter the plaintiff's flight, did not reduce the risk of harm to officers, and did not assist the officers in the orderly completion of the search."   Id.   Therefore, an interrogation in this situation would not be "carefully tailored to the

detention's underlying justification" and must be considered
"more intrusive than necessary."   Id.

 The argument could be made that Lawson's inquiry as to where
additional items of child pornography might be found was in
furtherance of the search, consistent with the stated rationales
in Summers.  Lawson's inquiry elicited Mittel-Carey's response,
"[I]t's all on the computer."  This interaction concerned the
details of the search and potentially narrowed its scope, better
preserving the privacy of the occupants of the house, and
generally facilitating the search for all concerned.  Summers,
however, indicated only that detained occupants might help the
police "open locked doors or locked containers to avoid the use
of force that is not only damaging to property but may also delay
the completion of the task at hand."  Summers, 452 U.S. at 703.
Lawson's inquiry did not seek Mittel-Carey's assistance in
opening locked compartments.  Rather, Lawson asked Mittel-Carey
to inculpate himself.  In this light, to authorize Lawson's
inquiry would be to read Summers as carving out, sub silentio, a
significant exception to Miranda.  Such an argument must be
rejected in light of the observation in Summers that such
detentions are "not likely to be exploited by the officer or
unduly prolonged in order to gain more information, because the
information the officers seek normally will be obtained through
the search and not through the detention."  Id. at 701.  See

also, e.g., Ganwich, 319 F.3d at 1122 (applying Miranda analysis
in context of Summers detention); United States v. Ritchie, 35
F.3d 1477, 1481 (10th Cir. 1994) (same); Freeman, 325 F. Supp. 2d
at 469 (same); United States v. Burns, 811 F. Supp. 408, 412-13
(E.D. Wis. 1993) (same).[3]

Thus, although Miranda warnings may only be required when an
individual is subject to custodial interrogation, a suspect
seized as an occupant of premises subject to a duly issued search
warrant is entitled to be free from excessive questioning
intended to elicit incriminating information.  E.g., Adams v.
Williams 407 U.S. 143, 146 (1972); Terry v. Ohio, 392 U.S. 1, 20
(1968) (explaining that the seizure must be "reasonably related
in scope to the circumstances which justified the interference in
the first place").

Having concluded that Summers did not carve out an exception
to Miranda, the Court now proceeds to set forth its reasoning for
holding that the statements Mittel-Carey made to the federal
agents should be suppressed because he was not read his Miranda
warnings.

_____

[3] In any event, no such argument, that Lawson's questioning
was in furtherance of the search, was ever made to this Court.
Rather, the government sought the whole hog, seeking
authorization for the full interrogations by Lawson and
Travaglia.  Thwarted, the government appeals, evidently seeking
to secure such authorization, in this Circuit, of what appears to
be standard FBI practice, at least during searches for child
pornography.

B.    **Miranda** **Analysis**

Stated again, the central issue presented in this case is whether the questioning during Mittel-Carey's detention pursuant to a lawful search of his home under Summers crossed the threshold from the kind protective of the search and seizure to "custodial interrogation" requiring the officers to issue Mittel-Carey his Miranda warnings before they initiated the interview.

The prosecution may not use statements of a defendant made during the course of a custodial interrogation unless procedural safeguards were in place "to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444. Miranda "requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued prior to questioning whenever a suspect is (1) interrogated (2) while in custody." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990).

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnotes omitted).

"Custody" is established when a individual's "freedom of movement is restrained to the degree comparable to a formal

arrest." United States v. Salyers, 160 F.3d 1152, 1159 (7th Cir. 1998) (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)). "Custody" is thus an elastic concept.  When individuals first encounter the police, there may be situations where an individual properly may be detained and subjected to limited questioning without requiring Miranda warnings.  See Berkemer, 468 U.S. at 436-40.  At the other end of the spectrum, even a properly incarcerated individual is not "in custody" for Miranda purposes when questioned about other crimes absent some additional measure of restraint "in addition to those normally imposed on a prisoner by virtue of his status as an inmate."  John v. Russo, ___ F. Supp. 2d ___, 2006 WL 2925204, at *10 (D. Mass. 2006) (brackets omitted) (quoting Commonwealth v. Larkin, 429 Mass. 426, 434 (1999) (collecting cases)).

While it is permissible to question suspects while temporarily seized without administering Miranda warnings (e.g., during execution of a proper search warrant), such questioning must be limited to seeking identification, verifying or dispelling suspicions of criminal conduct, or maintaining the status quo while obtaining more information.  E.g., Berkemer, 468 U.S. at 439-40; Adams, 407 U.S. at 146.

Custody determinations are mixed questions of law and fact that require a court to examine all the circumstances surrounding an interrogation.  United States v. Trueber, 238 F.3d 79, 93 (1st

14

Cir. 2001); <u>United States</u> v. <u>Ventura</u>, 85 F.3d 708, 711 n.2 (1st Cir. 1996).  The relevant inquiry is "how a reasonable man in the suspect's shoes would have understood his situation."  <u>Ventura</u>, 85 F.3d at 711.  Therefore, if "a reasonable person in [Mittel-Carey's] position would have believed that he was actually in police custody and [was] being constrained to a degree associated with formal arrest," then custody has been established for <u>Miranda</u> purposes.  <u>Trueber</u>, 238 F.3d at 93; <u>see also</u> <u>United States</u> v. <u>Pagan-Santini</u>, 451 F.3d 258, 263 (1st Cir. 2006) ("The test is whether a reasonable person would believe he is 'in custody' under the circumstances.").

Every custody determination must be made based on the facts of the specific case and must consider whether, in the particular situation, a reasonable person would have felt his freedom of movement restrained to a degree associated with formal arrest. There are no bright-line, dispositive factors.

The First Circuit has noted some factors to assist the inquiry.  Courts should consider, "among other inquiries, 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'"  <u>Trueber</u>, 238 F.3d at 93 (quoting <u>Ventura</u>, 85

15

F.3d at 711).[4]  Other circuits have indicated factors relevant to

custody analysis similar to those mentioned by the First Circuit.

For example, the Eighth Circuit has stated "the relevant factors

to be considered . . . include an accused's freedom to leave the

scene, and the purpose, place and length of the interrogation."

United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir.

1990)(citations omitted).

The Supreme Court has considered significant to the question

of custody the fact that an interrogation that takes place in an

environment that is "police dominated."  See Berkemer, 468 U.S.

at 438-39.  In Griffin, the Eighth Circuit explained that "[t]he

question is whether the entire context of the questioning,

including such considerations such as [the] place and length of

interrogation, demonstrates that the course of the investigation

was police dominated."  922 F.2d at 1352 (emphasis added)

(citations omitted).  The Eighth Circuit further explained that

"[o]ther circumstances which indicate police domination of the

custodial surroundings concern whether the police assume control

---

[4] Ironically, the facts in Trueber were more egregious than
those present here yet suppression was denied.  Trueber was
forced from a vehicle by local police with drawn guns.  Only then
did federal agents "invite" him to return to his motel room where
he was extensively interrogated without Miranda warnings.
Trueber, 238 F.3d at 83-84.  Trueber was this Court's case in the
district court and, in ordering suppression, this Court failed to
evaluate the facts using the appropriate test.  The First Circuit
properly vacated and remanded for application of the correct
legal test.  Id. at 93.  Here, this Court has applied the correct
test.

of the interrogation site and 'dictate the course of conduct
followed by the suspect' or other persons at the scene." Id.
(emphasis added) (brackets and citations omitted).

Courts have been reluctant to find the circumstances
custodial "when the interrogation occurs in familiar or at least
neutral surroundings." E.g., Ritchie, 35 F.3d at 1485 (internal
quotes omitted).  Understandably, interrogations occurring within
a suspect's home have been less likely to have been deemed
custodial.  The Supreme Court, however, has recognized that
interrogations conducted in public are inherently less coercive,
and therefore less likely to be considered custodial, than an
interrogation that occurs in a secluded, police dominated
environment.  Berkemer, 468 U.S. at 438-439.  The Supreme Court
reasoned that an interrogation in public reduces an element of
fear because there are bystanders able to witness the officer's
interactions.  Id.  Accordingly, the custody inquiry ought focus
less on the actual location of the questioning and more on the
circumstances surrounding the interrogation.  See United States
v. Beraun-Panez, 812 F.2d 578, 581 (9th Cir. 1987), as amended,
830 F.2d 127, 127-28 (holding a cattle ranger was in "custody" in
a remote part of the Idaho mountains); United States v.
Musgrave, 726 F. Supp. 1027, 1033 (W.D.N.C. 1989) (distinguishing
the detention of a suspect in his own home pursuant to a search
warrant from an ordinary traffic stop on the ground that in a

17

private home, officers are shielded from public view and more apt
to use "illegitimate means to elicit self-incriminating
statements").

The custody analysis thus requires a thorough assessment of
the situation in its entirety.  With these precedents in mind,
the Court held that a reasonable person in Mittel-Carey's
position would think that he was in custody.

Mittel-Carey may have been in his own home when the
interrogation began, but the atmosphere was entirely police
dominated and certainly more tense than a typical police inquiry
at one's residence.  See Griffin, 922 F.2d at 1354-55
("Questioning which occurs in the suspect's own home may provide
a margin of comfort, but . . . the setting of the interrogation
is not so important to the inquiry as the question of police
domination of that setting.") (citing Beraun-Panez, 812 F.2d at
582, as amended 830 F.2d 127-28).  Mittel-Carey was asleep when
he and his girlfriend were abruptly aroused at roughly 6:30 in
the morning by the clamor of eight FBI agents banging on his
door.  Once inside the home, an agent dashed through his bedroom
door with a flashlight in one hand and a loaded handgun in the
other.  Travaglia testified that he held the weapon behind his
right leg with the barrel pointed toward the floor.  The
government contended at the hearing that Mittel-Carey could not
have seen the gun due to Travaglia's careful positioning of the

18

weapon behind his leg. The Court infers, however, that Mittel-
Carey at least saw the weapon when Travaglia removed the gun from
behind his leg and placed it back in its holster.  Mittel-Carey
was then directed to get dressed, was escorted down the stairs,
and told to sit at the dining room table.

During the course of the search there were at least two
agents accompanying and escorting Mittel-Carey wherever he went.
Mittel-Carey was granted permission to use the bathroom, but only
with an agent standing in the threshold of the door watching him
while he relieved himself.  Mittel-Carey was directed where to
sit and was never told he was free to leave his own home nor was
he ever informed that he would not be arrested.  The remaining
agents who were not monitoring Mittel-Carey were scattered among
the house either monitoring Mittel-Carey's girlfriend or
participating in the search.

It is significant that during the entire time that Mittel-
Carey was taken downstairs for questioning, his girlfriend was
forced to go upstairs leaving Mittel-Carey secluded in the
presence of only FBI agents.  This practice has been labeled
inherently coercive and indicative of police domination and
accordingly, a reasonable person would likely feel less secure,
inherently vulnerable, and more confined in their freedom of
action.  See Beraun-Panez, 812 F.2d at 582, as amended 830 F.2d
127-28 ("The Supreme Court in Miranda noted that isolating a

subject from others, who might lend moral support to the person questioned and thereby prevent inculpatory statements, was a technique of psychological coercion.  By sending away the co-worker the officers asserted their dominion over the interrogation site and eliminated any last vestige of a public interrogation. Thus, the questioning occurred in a police-dominated atmosphere where Beraun-Panez was effectively isolated.") (citation omitted).

Mittel-Carey's girlfriend, Nystrom, testified at the hearing as to the character of the environment of her home that morning. Although she was not the subject of the agents' suspicions, she still felt she needed to ask permission to move about in her own home even after she was told she could leave.  She testified that she felt the agents "were in charge of her home" and that upon her request to shower and get ready for work, an agent monitored her while she retrieved clothes from her bureau and checked the bathroom before she entered.  She said that when she was about to leave the house, Mittel-Carey was allowed to speak to her briefly, but that an agent stood over them as they spoke and said good-bye.  The Court credits Nystrom's testimony.  Nystrom's testimony unequivocally professes a perception of a police dominated environment where compliance felt compelled.  Her reactions are representative of how a reasonable person would perceive the environment of the home.

Custody determinations ought consider how the officer's behavior and interactions with the suspect would affect an individual's perception of the situation.  Although custody does not follow from the police merely questioning a suspect, "the fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody."  <u>Griffin</u>, 922 F.2d at 1348 (citing <u>United States</u> v. <u>Carter</u>, 884 F.2d 368, 370 (8th Cir. 1989)).  Thus, a reasonable person's conception of his own individual freedom may be affected by his own knowledge of the evidence against him, were it to be explained by the officers.  <u>See</u> <u>Stansbury</u> v. <u>California</u>, 511 U.S. 318, 324 (1994).

In this case, Travaglia not only made the suspect aware of the evidence against him, but also gave Mittel-Carey the impression that it was fairly clear that he would be going to prison.  This case must be distinguished from other cases where being the focus of an investigation was only given minimal weight.  <u>See, e.g.</u>, <u>Carter</u>, 884 F.2d at 370 (stating that "there is little if anything in the record to suggest [that the defendant] knew of the evidence against him or that he was the focus of the investigation"); <u>United States</u> v. <u>Jimenez</u>, 602 F.2d 139, 145 (8th Cir. 1979) ("We are reluctant to draw such an inference [that the defendant knew he was the focus of the

21

investigation] unless it is clear that the officers had, prior to
their questioning, sufficient evidence to place the defendant in
the status of an accused or in a position analogous thereto and
that the defendant was aware of that status."). Here, Mittel-
Carey was made aware of the evidence against him. Travaglia
explained to him that the agents were searching his house
following an undercover operation in Florida that reported
Mittel-Carey had attempted to transmit child pornography to a
person whom he had thought was a 14-year-old girl.

Mittel-Carey was also told that, in connection with the
evidence of child pornography, his freedom in the imminent future
was about to be constrained by prison walls. Travaglia explained
to him that, in his experience, those persons who cooperated with
an investigation early on fared better in the long run and that
the sentencing guidelines have a provision for "accepting
responsibility" that might make Mittel-Carey eligible for a
potential reduction in sentence. Without saying anything more
about the penalties of Mittel-Carey's alleged offense, Travaglia
then told Mittel-Carey that "based on what [they] anticipated
[finding] on his computer and what he had already done, he was
looking at a lot of jail time."

In light of these circumstances, this Court held that a
reasonable person in the same circumstances faced by Mittel-Carey
would feel that his freedom of action was restrained, at least

for an indeterminate time, to a degree comparable to a formal
arrest.  The Court infers that a reasonable person, having been
told that the evidence against him warrants a lengthy prison
sentence would experience a severe contraction in his perception
of his personal freedom.  Although the agents did allow Mittel-
Carey to say good-bye to his girlfriend and to feed his rabbits
during the interrogation, the whole time there was an agent
standing over him or by his side.  The Court infers that even had
Mittel-Carey wanted to get dressed and get ready for work, a
reasonable person would have felt as he did at the time, that he
was in the custody of the FBI and would not have been permitted
to leave.  Considering the serious character of the situation,
the substantive information presented to the suspect, and the
police dominated atmosphere, a reasonable person would believe he
was under arrest and certainly would not think the agents would
leave the home without taking him with them.  Mittel-Carey was
thus in custody during his interrogation on January 20, 2005, and
should have been administered his <u>Miranda</u> rights.  Any self-
incriminating statements he made that morning must therefore be
suppressed.

     Upon such a record, this Court adheres to its ruling.

**III. CONCLUSION**

For the reasons set forth above, the Court held Mittel-Carey was in custody during the execution of a search warrant in his home on January 20, 2005.  Any incriminating statements he made to the agents during his interrogation are inadmissible because he was not duly appraised of his <u>Miranda</u> warnings.

/s/ William G. Young

_____

WILLIAM G. YOUNG
DISTRICT JUDGE